IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| Lilian Fuentes-Ortega, on her own behalf and on behalf of her minor children, H.Y.L.F. and B.M.L.F., | ) ) ) ) | Civil Action File No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| United States of America, | ) ) | |
| Defendant | ) | |

## COMPLAINT

## INTRODUCTION

1.     This action seeks damages for the minor children, H.Y.L.F. and B.M.L.F., caused by the United States government forcibly separating them from their mother, Lilian Fuentes-Ortega, when they lawfully entered the United States to seek asylum.  In all, H.Y.L.F. and B.M.L.F. were separated from their mother and deprived of her love, care, and support for one year, eight months, and fourteen days.

2.     This action also seeks damages for Lilian Fuentes-Ortega caused by the United States government's separation of her from her children.

3.     H.Y.L.F., B.M.L.F., and Lilian Fuentes-Ortega (collectively, "Plaintiffs") bring their claims against the United States government under the

Federal Tort Claims Act, 28 U.S.C. § 1346.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this claim for money damages against the United States pursuant to 28 U.S.C. § 1346(b)(1).

5.    Plaintiffs have exhausted their FTCA claims. Plaintiffs filed all required administrative forms with each of the relevant agencies of the United States of America more than six months ago. There has been no final disposition of their administrative claims, and Plaintiffs now exercise the option to deem those claims denied pursuant to 28 U.S.C. § 2675(a).

6.    A substantial portion of the acts and omissions giving rise to the claims occurred in this district. Venue is therefore appropriate under 28 U.S.C. §§ 1391 and 1402(b).

## PARTIES

7.    Plaintiffs are Guatemalan nationals who currently reside in Chattooga County, Georgia.  Plaintiff Lilian Fuentes-Ortega ("Lilian") brings this action on behalf of herself and her minor children, H.Y.L.F. and B.M.L.F.

8.    At all relevant times, Plaintiffs were monolingual Spanish speakers.[1]

9.    In November 2017, Lilian fled to the United States with H.Y.L.F. and

---

[1]  H.Y.L.F. and B.M.L.F. have since learned some limited English in school.

B.M.L.F, seeking asylum.

10.     H.Y.L.F. is an eleven-year-old boy.  He is Lilian's son.  At the time
U.S. Customs and Border Patrol ("CBP") separated him from Lilian, he was eight
years old.

11.     B.M.L.F. is a fourteen-year-old boy.  He is Lilian's son.  At the time
U.S. Customs and Border Patrol ("CBP") separated him Lilian, he was twelve
years old.

12.     Defendant United States of America is a proper defendant under the
FTCA. *See* 28 U.S.C. §§ 1346(b), 2671, *et seq*. The United States is sued for the
Plaintiffs' personal injuries, caused by the wrongful acts or omissions of its
employees, including employees of the Department of Health and Human
Services' Office of Refugee Resettlement; the Department of Homeland Security
(DHS) and its constituent units, CBP, U.S. Immigration and Customs
Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS");
and the contractors that the agencies directly supervised. Those employees and
contractors were acting within the scope of their employment under
circumstances where the United States, if a private person, would be liable to
Plaintiffs in accordance with the law of the places where the act or omission
occurred. *See* 28 U.S.C. § 1246(b).

## STATEMENT OF FACTS

**A.    Plaintiffs come to the United States seeking asylum.**

13.    In early November 2017, Lilian, H.Y.L.F., and B.M.L.F. fled Guatemala.  In Guatemala, they had been subjected to severe abuse and violence at the hands of H.Y.L.F. and B.M.L.F.'s father, who was a police officer, and Lilian's stepfather, who had threatened to kill her.

14.    Lilian took the drastic step of escaping from the only country she had known because she feared her life and the lives of H.Y.L.F. and B.M.L.F. would be at risk if they remained.

15.    After a journey across Mexico, Plaintiffs crossed into the United States on or about November 25, 2017 at Alta Sonora, Arizona.

16.    Plaintiffs viewed the United States as a place where they would be able to seek refuge in safety.  Though nervous, they were happy when they entered the United States because, at the time, they believed they were leaving all of the hardship and violence behind them.

17.    Instead, the United States government saw to it that they would find neither refuge nor safety.

18.    Plaintiffs fell victim to a deliberate United States government policy using the cruelty of forced family separation to deter them and future migrants from seeking asylum.

19.     Upon entering the United States, Plaintiffs looked for and found a CBP sentry station, turned themselves in, and told a CBP officer they were seeking asylum.

20.     CBP then detained Plaintiffs and put them in a secured van.

21.     While in the van, H.Y.L.F. and BMLD became upset and scared. Lilian tried to reassure them by telling them everything would be okay.

**B.     CBP Imprisons Plaintiffs in an "Ice Box."**

22.     CBP, transported Plaintiffs in the van to a CBP holding center.

23.     The CBP holding center is commonly referred to as an "Ice Box" because temperatures inside are very cold.

24.     When Plaintiffs arrived at the Ice Box, CBP placed them in a large room with about four other mothers and their children.

25.     The room only had two metal benches where the Plaintiffs and other detained families could sit.

26.     The room was all concrete and did not have any windows allowing in natural light.  The only window allowed a view from another room.  CBP officers used the window observe the families detained in the room.

27.     The temperature in the room was very cold.  Plaintiffs were shivering and not able to warm up while they were in the room.

28.     The lights were always on in the room.

29.    The toilets in the room were visible to everybody.  The other families in the room could see Plaintiffs urinate and defecate.

30.    CBP did not provide Plaintiffs with a bed, cot, sheets, blankets, or pillows.  Instead, CBP only provided Plaintiffs with a thin mattress and aluminum foil-like tarps to use as bedding.  Plaintiffs either had to sleep on the thin mattresses and tarps directly on the cold, concrete floor, or on the metal benches because they were a little warmer.

31.    Plaintiffs were hungry when they arrived at the Ice Box.  CBP did not provide Plaintiffs with adequate food.  They were only given a small burrito and a juice box after about three hours.

32.    When H.Y.L.F. started chewing on his burrito, he noticed there was trash—possibly part of the burrito wrapper—in his mouth.  He spit out the trash. A CBP agent yelled at H.Y.L.F.  in Spanish, in front of the other families, "What are you doing?  Take off your sweater and clean my floor!"  H.Y.L.F. was frightened, trembling, and sobbing.

33.    When the CBP officer yelled at H.Y.L.F., Plaintiffs were terrified. They thought the CBP agent was going to physically attack H.Y.L.F.. Fearing for his safety—and particularly because he had witnessed and experienced violence in Guatemala—H.Y.L.F., still trembling, took off his sweater and used it to clean the floor.

34.     Though conditions at the Ice Box were terrible, Plaintiffs were able to provide each other some minimal physical and emotional comfort: leaning on each other, hugging, Lilian trying to reassure her children.

35.     Plaintiffs thought they would remain together.

**C.     U.S. Government Officials Forcibly Separate H.Y.L.F. and B.M.L.F. from Lilian.**

36.     Then, at about 1:00 a.m., after about 24 hours at the Ice Box, CBP officers told Lilian her children would be taken from her and would be placed in the hands of the government.

37.     A CBP officer then took Lilian out of the room where Plaintiffs were imprisoned to speak with a man and a woman who were not wearing CBP uniforms.

38.     Upon information and belief, the man and the woman were employees or contractors of ORR.

39.     The man and the woman told Lilian she would be separated from B.M.L.F. and H.Y.L.F..

40.     They did not tell Lilian where B.M.L.F. and H.Y.L.F. would be taken; only that the government would take them to "another place."

41.      Lilian asked the man and woman if B.M.L.F. and H.Y.L.F. would stay with the government.  The man and the woman told Lilian they would stay

with the government, but they refused to provide any additional details.

42.     Sobbing, Lilian begged the man and the woman to let her remain together with her children.

43.     The woman responded, "the laws are the laws."

44.     Lilian then had to tell B.M.L.F. and H.Y.L.F. that they would be separated from her and that she did not know what was going to happen.  Lilian tried to comfort them, but she could not.  Lilian, B.M.L.F., and H.Y.L.F. were all crying.

45.      The woman told Plaintiffs to say goodbye to each other; that they would be separated.

46.     Lilian told the woman, "They are my children.  I can't let them go."

47.     The man and the woman both told Plaintiffs they did not have a choice, and CBP took H.Y.L.F. and B.M.L.F. away from Lilian.

48.     Plaintiffs were distraught.  They did not know why they were getting separated and worried they may never see each other again.

49.     When CBP separated Plaintiffs, H.Y.L.F. was eight years old and B.M.L.F. was twelve years old.

**D.     U.S. Government Officials take H.Y.L.F. and B.M.L.F. to a Shelter in Fullerton, California, Where They Are Separated from Each Other.**

50.     The man and the woman put H.Y.L.F. and B.M.L.F. in the back of a

van.  A little girl who was about four years old was in the van with them.

51.     The entire time H.Y.L.F., B.M.L.F., and the four-year-old girl were in the van, they were all crying.

52.     B.M.L.F. asked the man and the woman where his mother was.  The woman said everything would be fine and he should be quiet.

53.     The man and the woman took B.M.L.F., H.Y.L.F., and the four-year-old girl to an airport.

54.     At the airport, another woman came and took the four-year-old girl.

55.     The man and the woman took B.M.L.F. and H.Y.L.F. to an office. The man and woman told them to sit and wait.

56.     B.M.L.F. and H.Y.L.F. waited alone in the office until they were escorted to and boarded a plane.

57.     B.M.L.F. and H.Y.L.F. had no idea where the plane was taking them. They had never been on a plane before.

58.     Over the course of the approximately one hour, forty minute flight, all B.M.L.F. and H.Y.L.F. could think about was that they were getting farther and farther from their mother, who had been their only source of love and support for their entire childhood.

59.     The plane landed at another airport.  Upon information and belief, the airport was in the Los Angeles, California region.

60.     At the airport, two women came and retrieved B.M.L.F. and H.Y.L.F. from the gate.

61.     B.M.L.F. and H.Y.L.F. still did not know where they were, nor what was going to happen to them.  They were terrified.

62.     The women drove B.M.L.F. and H.Y.L.F. about a half hour to a shelter.  In the car, H.Y.L.F. was crying.  The women did not comfort H.Y.L.F.. They told him to be quiet.

63.     Upon information and belief, the shelter, which Crittenton Services for Children and Families operated, was in Fullerton, California.

64.     At the shelter, some adults separated H.Y.L.F. from B.M.L.F..

65.     H.Y.L.F. was taken to another building at the shelter.

66.     Nobody explained to H.Y.L.F. or B.M.L.F. why they were separated; nor whether or when they would see each other again.

67.     H.Y.L.F. and B.M.L.F. desperately wanted to be with each other. After the trauma of the forced separation from their mother, H.Y.L.F. and B.M.L.F. now thought they would each be taken to different places, and they would be put somewhere dangerous where they could not support or comfort each other.

68.     While H.Y.L.F. and B.M.L.F. were separated, H.Y.L.F. was extremely upset and terrified.  He cried almost incessantly, became ill with a fever, and his

entire body ached.

69.    H.Y.L.F. and B.M.L.F. spent the first night at the shelter in separate

dormitories with other children they did not know.

70.    The next day, H.Y.L.F. and B.M.L.F. were reunited.

71.    At this point B.M.L.F. realized H.Y.L.F. was sick.  B.M.L.F. was very

worried and upset about H.Y.L.F's health.

72.    B.M.L.F. and H.Y.L.F. remained together for the remainder of their

time at the shelter.

73.    H.Y.L.F. continued to suffer stress-driven health issues throughout

the time he was held at the shelter.  He had severe digestive issues, headaches,

and body aches.  He had a hard time sleeping.

**E.    Lilian is ridiculed when she tries to learn information about her**
**children, and she is tricked into signing deportation papers.**

74.    After U.S. government officials forcibly separated H.Y.L.F. and

B.M.L.F. from Lilian, she remained a short time at the Ice Box with other mothers

who had been separated from their children.  Lilian recalls, "There was a lot of

pain in that room."

75.    Lilian then was moved to an ICE detention center near Phoenix,

Arizona.

76.    While she was at the detention center, she tried to learn the

whereabouts of H.Y.L.F. and B.M.L.F..  She knew they would be terrified and

traumatized without her, and she desperately wanted to comfort them.

77.     Nobody provided Lilian with any information about H.Y.L.F. and

B.M.L.F..

78.     Lilian asked one ICE officer, "Excuse me, what are you doing with

my children?"

79.     The ICE officer responded, "They're in the hands of the government

now.  You won't see them again."

80.     Throughout her detention, Lilian had told several CBP and ICE

officers she feared returning to Guatemala and she wanted to apply for asylum.

81.     At the ICE detention center, an ICE officer handed Lilian some

forms in English and told Lilian to sign them.

82.     The ICE officer pressured Lilian to sign the forms and did not give

her an opportunity to have them translated into Spanish.

83.     Lilian thought the purpose of the forms was to be reunited with her

children.

84.     When Lilian asked the ICE officer what the forms were, he laughed

at her and told her, "Just sign them."

85.     Lilian signed the forms.

86.     A few days later, an ICE officer told her the forms allowed ICE to

deport her.

87.     Lilian told the ICE officer, "I came here looking for protection. What's happening?  You're harming us!"

88.     The ICE officer said, "this isn't my problem."

**F.     Lilian is deported to Guatemala.**

89.     On or about December 12, 2017, ICE forced Lilian onto a plane and deported her to Guatemala.

90.     For the duration of the flight, Lilian was upset and crying.  She was terrified for her children, and she also was worried about her safety once she arrived in Guatemala.

91.     Fearing for her life, Lilian went into hiding once she arrived in Guatemala.

92.     She remained in hiding for four months.

**G.     Lilian is able to communicate with B.M.L.F. and H.Y.L.F., but the communications provide little comfort.**

93.     When Lilian arrived in Guatemala, she did not have any money or a telephone.  Therefore, she had no way to make any inquiries about B.M.L.F. and H.Y.L.F.

94.     Almost a week later, Lilian was able to borrow a phone, and she reached out to Thelma, a family member who lived in the United States, to see if

she had heard from B.M.L.F. or H.Y.L.F..  She had not.

95.     Weeks later, Thelma reported she finally had communicated with B.M.L.F..

96.     Shortly after that, Lilian was able to have separate 20-minute calls with B.M.L.F. and H.Y.L.F..  During the calls, B.M.L.F., H.Y.L.F., and Lilian were upset and crying.  Though they were relieved to know, at a basic level, they each were alive—even if not safe—they were very worried about each other.  B.M.L.F. and H.Y.L.F. were scared their father or Lilian's stepfather would find her and harm her.  Lilian could tell B.M.L.F. and H.Y.L.F. felt alone, upset, and scared.

97.     During the calls, Lilian felt like the emotional pain was almost unbearable because she could hear B.M.L.F. and H.Y.L.F., she could tell they were distressed, but she could not see them or hug them.

98.     Over the course of the calls, Lilian learned B.M.L.F. and H.Y.L.F. were depressed and anxious due to the forced separation and isolation.  She learned H.Y.L.F. in particular was becoming self-destructive and suffered from chronic digestive problems as a consequence of the stress.

99.     Lilian was worried B.M.L.F. and H.Y.L.F. would suffer more harm.

100.     Lilian fell into a deep depression.  She felt like B.M.L.F. and H.Y.L.F. first suffered in Guatemala because of the threats and violence, and now they were suffering in the United States, though she brought them to the United

States to protect them from the violence.

101.    Lilian thought about suicide.  She called Thelma and told her to take care of B.M.L.F. and H.Y.L.F. if something happened to her.

102.    Lilian could barely eat or hold down food.

103.    She suffered from insomnia because of the anxiety.

**H.    H.Y.L.F. and B.M.L.F. are released to their aunt in Georgia.**

104.    Thelma, having learned H.Y.L.F. and B.M.L.F. were in a shelter, immediately started taking steps to have them released into her custody.

105.    After H.Y.L.F. and B.M.L.F. were forced to live at the shelter without their mother or any other family for approximately three months, they were transported to Atlanta, Georgia and released to Thelma's custody.

106.    Together, H.Y.L.F., B.M.L.F., and Thelma traveled to Trion, Georgia, where Thelma lived.

107.    Though life with Thelma in Trion was better than life in the shelter, it was still emotionally difficult for H.Y.L.F. and B.M.L.F. to be away from their mother.

108.    H.Y.L.F. in particular continued to struggle with digestive issues and insomnia.  His personality changed, and he was quick to anger.

**I.**    **After renewed threats to her life, and panic-stricken about her children, Lilian again flees Guatemala and enters the United States.**

109.    While Lilian was in hiding, she lived in Tajamulco, a small town in the mountains of western Guatemala.

110.    However, her hometown was San Jose Ojetenam, Guatemala, which was a couple hours by bus from Tajamulco.  This is also where H.Y.L.F. and B.M.L.F.'s father and Lilian's stepfather had lived.

111.    In April or May 2018, she traveled to San Jose Ojetenam to retrieve some documents she needed.  She planned to keep a low profile, and she did not think H.Y.L.F. and B.M.L.F.'s father and her stepfather still lived there.

112.    Unfortunately, her stepfather did live there, and he tracked her down.

113.    Drunk, he kidnapped her, physically assaulted her, and threatened to kill her.

114.    Lilian escaped and fled to Guatemala City, but she learned from an aunt that H.Y.L.F. and B.M.L.F's father was looking for her there.

115.    Terrified that she would be killed, and distraught that she could not be with her children, she decided to try to return to the United States.

116.    In late June 2018, Lilian crossed into the United States near Eagle Pass, Texas and again presented herself to CBP.  She told the CBP officers she

feared returning to Guatemala, and she was looking for her children.

117.    CBP arrested her and transferred her to a jail in Eagle Pass.  While she was in the jail, she had no way to reach her children.

118.    After about six months in the jail, she was transferred to an ICE detention center in Texas.  At the detention center, she was able to work for about one dollar per day.  She saved this money and used it to call H.Y.L.F. and B.M.L.F.  This was the first time she had been able to speak with them since she fled Guatemala.

119.    Because calls were expensive and her earnings in ICE detention were meager, she only was able to speak with H.Y.L.F. and B.M.L.F.  a few times.

120.    ICE imprisoned Lilian for about five months at the detention center in Texas.

121.    ICE officers told Lilian she would be deported to Guatemala again.

122.    ICE then transferred Lilian to the Irwin County Detention Center ("ICDC") in Ocilla, Georgia.

123.    On August 8, 2019, an immigration attorney was able to secure Lilian's release from ICDC.

124.    Throughout their separation—until the day Lilian was released—Plaintiffs feared they would never see each other again.

**J.    Lilian is reunited with H.Y.L.F. and B.M.L.F., but the harm of their separation continues.**

125.    On the evening of August 8, 2019, Lilian was reunited with H.Y.L.F. and B.M.L.F. in Trion.

126.    Because of the forced separation, Lilian and her children had not seen each other for one year, eight months, and fourteen days.

127.    Lilian continues to suffer the ramifications of the forced separation.

128.    Her relationship with her children, and particularly with H.Y.L.F., is strained.

129.    Lilian has a hard time getting H.Y.L.F.'s attention.  He gets very angry at her and blames her for all of the harm that happened to him.  He frequently asks her why she caused him to be separated from her.

130.    H.Y.L.F. is frequently ill as a result of the emotional trauma and anxiety caused by the separation.  He continues to struggle with gastrointestinal problems, muscle aches, and insomnia.  Because of the health issues, H.Y.L.F. has missed multiple days of school.

131.    This has caused Lilian considerable stress and anxiety.

132.    Lilian constantly deals with feelings of guilt because her children, and particularly H.Y.L.F., suffered psychological harm.

## COUNT I

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (All Plaintiffs)

133.    The other paragraphs of this complaint are incorporated as if set forth here.

134.    This Count sets forth claims of all Plaintiffs.

135.    By engaging in the acts described in this Complaint, the federal employees, officials, and contractors referenced above engaged in extreme and outrageous conduct with an intent to cause, or in reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

136.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

137.    The conduct described herein violated Georgia and Arizona law prohibiting intentional infliction of emotional distress.

138.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

## COUNT II

## BREACH OF FIDUCIARY DUTY

## (H.Y.L.F. and B.M.L.F.)

139.    The other paragraphs of this complaint are incorporated as if set forth here.

140.    This Count sets forth claims of H.Y.L.F. and B.M.L.F..

141.    The federal employees, officials, and contractors referenced above were guardians of H.Y.L.F. and B.M.L.F.

142.    In turn, H.Y.L.F. and B.M.L.F. were wards of the federal employees, officials, and contractors.

143.    As guardians of children housed in federal facilities, these federal employees, officials, and contractors had a fiduciary relationship to H.Y.L.F. and B.M.L.F.

144.    Among their obligations as guardians, the federal employees, officials, and contractors were obligated to act in the best interest of H.Y.L.F. and B.M.L.F.

145.    As described more fully throughout this complaint, these federal employees, officials, and contractors breached these fiduciary duties to H.Y.L.F. and B.M.L.F.

146.    The conduct described herein constituted a breach of fiduciary duty,

in violation of Georgia and Arizona law.

147.    As a direct and proximate result of those breaches, H.Y.L.F. and B.M.L.F. suffered severe emotional distress.

148.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for breach of fiduciary duty.

## COUNT III

## NEGLIGENCE

## (All Plaintiffs)

149.    The other paragraphs of this complaint are incorporated as if set forth here.

150.    This count sets forth claims of all Plaintiffs.

151.    The federal employees, officials, and contractors referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

152.    By engaging in the acts alleged herein, the federal employees, officials, and contractors failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

153.    The conduct described herein constituted negligence, in violation of Georgia and Arizona law.

154.    As a direct and proximate result of the referenced conduct, Plaintiffs

suffered substantial damages.

155.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

## COUNT IV

## NEGLIGENT SUPERVISION

### (All Plaintiffs)

156.    The other paragraphs of this complaint are incorporated as if set forth here.

157.    This count sets forth claims of all Plaintiffs.

158.    Plaintiffs suffered damages from foreseeable misconduct of employees, officials, and contractors supervised by the Defendant.

159.    The government's employees in supervisory roles have a duty to properly supervise federal employees, officers, and contractors and to oversee their treatment of immigrants in their custody.

160.    The disregard for Defendant's own internal policies and standards by federal employees, officers, employees, and contractors also shows the supervisors were negligent in their non-discretionary duties to supervise individual employees, officers, and contractors.

161.    The conduct described herein constituted negligent supervision, in violation of Georgia and Arizona law.

162.    The government's negligent supervision proximately caused the unlawful conduct described herein, including the violation of non-discretionary, mandatory obligations imposed on the federal agencies that had custody of Plaintiffs.

163.    As a proximate result of this negligent supervision, Plaintiffs suffered the injuries described herein.

164.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligent supervision.

## COUNT V

## ABUSE OF PROCESS

## (All Plaintiffs)

165.    The other paragraphs of this complaint are incorporated as if set forth here.

166.    This count sets forth claims of all Plaintiffs.

167.    The government's employees, officials, and contractors maliciously abused otherwise legally and properly issued legal processes within their control for purposes the legal processes never were intended to effect: traumatizing Plaintiffs, coercing Plaintiffs to abandon their lawful claims to asylum, and deterring future migrants from seeking refuge in the United States.

168.    The government's conduct described herein constituted abuse of

process, in violation of Georgia and Arizona law.

169.   Plaintiffs. were injured by this misconduct, as described herein.

170.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for abuse of process.

## COUNT VI

## LOSS OF CONSORTIUM (ARIZONA)

### (All Plaintiffs)

171.   The other paragraphs of this complaint are incorporated as if set forth here.

172.   This count sets forth claims of all Plaintiffs.

173.   Plaintiffs had a legal right to parent child consortium, which the government's employees, officials, and/or contractor violated.

174.   As a consequence of the government's actions described herein, Plaintiffs lost their capacity to exchange love, affection, society, companionship, comfort, care, and moral support.

175.   The substantial mental and physical injuries suffered by Plaintiffs continue to frustrate their ability to interact and communicate as a family in a normally gratifying way.

176.   The government's conduct described herein constituted abuse of process, in violation of Arizona law.

177.    Plaintiffs. were injured by this misconduct, as described herein.

178.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for loss of consortium.

## PRAYER FOR RELIEF

Plaintiffs respectfully demand as follows:

(1) Compensatory damages;

(2) Punitive damages;

(3) Attorneys' fees and costs; and

(4) Such other and further relief as the Court may deem just and appropriate.

Respectfully submitted this 17th day of November, 2020.

/s/ Daniel Werner
Daniel Werner
Georgia Bar No. 422070
dan@decaturlegal.com
James Radford
Georgia Bar No. 108007
james@decaturlegal.com
RADFORD & KEEBAUGH, LLC
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
(678) 271-0300

*Attorneys for Plaintiff*